IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| STEVENS VAN LINES, INC., ET AL., Plaintiffs v. THE UNITED STATES, Defendant | No. 05-1278C (Judge Smith) |

# PLAINTIFFS' OPPOSITION TO DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT AND REPLY TO DEFENDANT'S OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

ALAN F. WOHLSTETTER
DENNING & WOHLSTETTER
815 Connecticut Avenue, N.W.
Suite 500
Washington, D.C. 20006
Tel: (202) 833-8884
Fax: (202) 833-8886
Attorney for Plaintiffs

STANLEY I. GOLDMAN
DENNING & WOHLSTETTER
Of Counsel

November 6, 2006

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES .......... iii

INDEX TO PLAINTIFFS' SUPPLEMENTAL APPENDIX .......... iv

INTRODUCTION .......... 1

ARGUMENT .......... 2

I. THE DETERMINATION THAT THE POWERTRACK FEE WOULD CONTINUE TO BE REIMBURSED WAS MADE BY THE CHIEF OF SDDC'S PERSONAL PROPERTY DIVISION IN INTERPRETING THE FEDERAL REGISTER NOTICE HE ISSUED AND IS BINDING ON DEFENDANT .......... 2

1. Federal Register Notice .......... 4

2. Mr. Hicks' Position and Job Description .......... 8

3. The Law .......... 11

4. Colonel Amato Should Be Found to Have Ratified Mr. Hicks' Determination to Continue Reimbursement of the PowerTrack Fee .......... 16

II. ALTERNATIVELY, THE AMBIGUITY ESTABLISHED BY THE CONFLICTING INTERPRETATIONS OF COLONEL AMATO AND MR. HICKS AS TO WHETHER SDDC WAS TO REIMBURSE THE POWERTRACK FEE DURING IW/DW05 SHOULD BE CONSTRUED AGAINST SDDC AS THE DRAFTER OF THE FEDERAL REGISTER NOTICE .......... 19

III. EVEN SHOULD THE COURT HOLD THAT MR. HICKS' INTERPRETATION OF THE FEDERAL REGISTER NOTICE IS WITHOUT LEGAL EFFECT, TSPS ARE FREE FROM THE REQUIREMENT TO USE POWERTRACK WITHOUT REIMBURSEMENT BECAUSE OF DEFENDANT'S FAILURE TO MAKE FAMILIES FIRST EFFECTIVE ON OCTOBER 1, 2005 .......... 25

IV. SHOULD THE COURT HOLD THAT SDDC IS NOT BOUND BY MR. HICKS' INTERPRETATION OF HIS FEDERAL REGISTER NOTICE OF FEBRUARY 3, 2005, PLAINTIFFS ARE ENTITLED TO QUANTUM MERUIT COMPENSATION FOR THEIR REQUIRED POWERTRACK BILLINGS……………………………………………….....................27

CONCLUSION………………………………………………………………………28

# TABLE OF AUTHORITIES

Page

## I. CASES

Brunner v. United States, 70 Fed. Cl. 623 (2006)............................6

Dolmatch Group, Ltd. v. United States, 40 Fed. Cl. 431 (1998)...........17

Dureiko v. United States, 62 Fed. Cl. 340 (2004)............................6

* Gresham & Company, Inc. v. United States, 470 F.2d 542 (Ct. Cl. 1972)..13

* H. Landau & Company v. United States, 886 F.2d 322 (Fed. Cir. 1989)... 14

* Max Drill, Inc. v. United States, 427 F.2d 1233 (Ct. Cl. 1970)..............11

* Neal & Co. v. United States, 19 Ct. Cl. 463 (1990)........................22, 25

Sun Shipbuilding and Dry Dock Company v. United States, 393 F.2d 807 (Ct. Cl. 1968)...........................................................21

* Telenor Satellite Service, Inc. v. United States, 71 Fed. Cl. 114 (2006)....15, 17

* Williams v. United States, 127 F. Supp. 617 (Ct. Cl. 1955)................18

Xplo Corporation, DOT BCA No. 1250, March 31, 1986, 86-2 BCA ¶18863..........................................................10

## II. OTHER AUTHORITIES

Administration of Government Contracts, Cibinic and Nash (3rd Ed.)......10

13 Corbin on Contracts, §68.4(3) (a) (2003)..................................27

* Cases chiefly relied upon.

# PLAINTIFFS' SUPPLEMENTAL APPENDIX

1. Defendant's Responses to Plaintiffs' Interrogatories Nos. 11, 12, 13… .1

2. SDDC's Response to Military/Industry Symposium Item re PowerTrack – March 17, 2005……………………………………….4

3. E-mail, dated November 16, 2005, from George Thomas to Tom Hicks, et. al……………………………………………………..5

4. Tom Hicks, Chief of Personal Property Division – Job Description……………………………………………………….6

5. Federal Register Notice, 68 Fed. Reg. 33683, et seq., June 5, 2003……………………………………………………….. 12

6. Federal Register Notice, 68 Fed. Reg. 55947, et seq., September 29, 2003……………………………………………………14

7. Colonel Steven L. Amato, Deputy Chief of Staff for Passenger and Personal Property – Job Description………………………………16

8. Department of Defense Web site Administrative Policies and Procedures, Part II.3. Information Posting Process………….............17

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| STEVENS VAN LINES, INC., ET AL., | ) | |
| Plaintiffs | ) | |
| v. | ) | No. 05-1278C (Judge Smith) |
| THE UNITED STATES, | ) | |
| Defendant | ) | |

PLAINTIFFS' OPPOSITION TO DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT AND REPLY TO DEFENDANT'S OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

## INTRODUCTION

In its Opposition and Cross-Motion, defendant stated:

> "This case will be resolved by the Court's determination of whether Mr. [George] Thomas's communications are contractually enforceable against the Government." (Defendant's Brief, p. 3).

However, defendant's response to plaintiffs' discovery revealed that defendant had concealed the fact that the determination to continue in full force and effect reimbursement of the PowerTrack Fee until Families First was rolled out was made by Tom Hicks, Chief of Defendant's Personal Property Division, who issued the Federal Register Notice of February 3, 2005 on which defendant relies, and not by George Thomas, who informed industry representatives that the PowerTrack fee would continue to be reimbursed.

In this Reply we show that Mr. Hicks had the authority to continue reimbursement of the PowerTrack Fee just as he provided for its payment in the first place. That authority derives from the fact that he was Chief of defendant SDDC's Personal Property Division and issued all three Federal Register Notices relating to the use of PowerTrack in the Personal Property program and the payment of the PowerTrack fee. We also maintain, in the alternative, that Mr. Hicks' action was ratified Col. Amato by his failure to timely countermand Mr. Hicks' action, which action was communicated to and relied on by plaintiffs.

As separate and distinct contentions, which do not involve the question of contract authority, we maintain that plaintiffs should prevail under the doctrine of contra proferentum because of the failure of defendant SDDC to discharge a material obligation of the arrangement, namely, make DPS and Families First effective on October 1, 2005; and lastly, in any event, plaintiffs are entitled to quantum meruit compensation.

## ARGUMENT

### I. THE DETERMINATION THAT THE POWERTRACK FEE WOULD CONTINUE TO BE REIMBURSED WAS MADE BY THE CHIEF OF SDDC'S PERSONAL PROPERTY DIVISION IN INTERPRETING THE FEDERAL REGISTER NOTICE HE ISSUED AND IS BINDING ON DEFENDANT.

By its responses to plaintiffs' interrogatories, defendant admits, for the first time, that the determination the PowerTrack fee would continue to be reimbursed

until Families First Phase II, also known as DPS,[1] became effective was made by Tom Hicks, Chief of SDDC's Personal Property Division (Pl. Supp. Fact No. 28).[2] Mr. Hicks issued the Federal Register Notice relied on by defendant, (Pl. Supp. Fact No. 27) and George Thomas,[3] as the PowerTrack representative designated in the Federal Register Notice, conveyed Mr. Hicks' advice to representatives of the TSPs, including plaintiffs, that reimbursement of the PowerTrack fee would continue until Families First became effective by e-mails transmitted during June, July and August 2005. (Pl. Fact Nos. 10, 11, 12, 13, 14).

Defendant admitted, for the first time, that Mr. Hicks advised Mr. Thomas that reimbursement of the PowerTrack fee was to continue and that Mr. Hicks knew that Mr. Thomas had conveyed this information to TSP representatives during the rate-filing process for IW05 and DW05. (Pl. Supp. Fact Nos. 28 and 29). In response to Interrogatory No. 11, defendant stated:

---

1 References in this Brief to "Families First" are to SDDC's proposed best value procurement, also referred to as "DPS," which has been postponed and is now not scheduled to become operative until May 15, 2007.

2 References in this brief are: "Pl. Fact No. ___" is to a paragraph of Plaintiffs' Proposed Findings of Uncontroverted Fact"; "Pl. Supp. Fact No. 11 is to a paragraph of Plaintiffs Supplemental Proposed Findings of Uncontroverted Fact; "Pl. App." is to a page of Plaintiffs' Appendix and "P1. Supp. App." is to a page of Plaintiffs' Supplemental Appendix.

3 In light of defendant's admission that Tom Hicks, and not George Thomas, determined that reimbursement of the PowerTrack fee would continue, we assume that defendant will now make its "lack of authority" argument against Tom Hicks. In its brief, defendant stated:

> "This case will be resolved by the Court's determination of whether Mr. Thomas's communications are contractually enforceable against the Government." (Def. Br., p. 3).

> "Mr. Thomas recalls being informed by Mr. Hicks through several verbal communications that the one percent PowerTrack fee would be reimbursed to TSP[s] until DPS rolls out. Mr. Thomas recalls these communications being made around the time of the June 2005 and August 2005 emails identified in Interrogatory No. 12."
> (P1. Supp. App. 1-2).

Interrogatory No. 12 requested defendant to identify SDDC's officers and employees who had knowledge of the content of the Mr. Thomas's emails. Defendant responded:

> "All senior officers in the Passenger and Personal Property Directorate of SDDC eventually became aware of the emails identified in interrogatory number 12. The individuals with contemporaneous knowledge of the emails are identified in the 'to' and 'cc' lines of the emails. <u>In addition to those individuals, Steffen Frey, Steve Savage and Tom Hicks also had contemporaneous knowledge.</u>" (Emphasis added).
> (P1. Supp. App. 2).

Defendant also admitted in response to Interrogatory 13 that Mr. Hicks knew of SDDC's Web site posting of August 2005 which informed TSPs that the reimbursement of the PowerTrack fee would continue until DPS rolls out. (Pl. Supp. Fact. No. 30).

1. <u>The Federal Register Notice</u>

These admissions by defendant establish first, that Mr. Hicks, SDDC's Chief of its Personal Property Division, who issued the Federal Register Notice relied on by defendant, determined that the PowerTrack fee reimbursement would continue until Families First was rolled out; and second, that he knew his advice was given

by Mr. Thomas to TSPs during the rate-filing process for IW/DW05.[4]

As Chief of SDDC's Personal Property Division, Mr. Hicks, who issued the Federal Register Notice, February 3, 2005 (Pl. App. 70-71), which provided for reimbursement of the PowerTrack fee, had authority to determine how long that reimbursement would continue in light of the changed circumstances resulting from the postponement of Families First. Specifically, the postponement of Families First delayed the conversion of the personal property procurement from a cost-driven procurement to one of best value (70 percent service and 30 percent cost) (Pl. Fact No. 3); the DPS rates which were scheduled to be effective October 1, 2005, were never filed; the rates for IW05 and DW05 were no longer to be back-up rates to be applied only if Families First was terminated (Pl. Fact. No. 5); and the DW05 rates were rescheduled to become effective November 1, 2005, instead of October 1. (Pl. App. 15).

Defendant admits that Mr. Hicks had authority to issue the February 3, 2005 Federal Register Notice which provided that the reimbursement would cease on October 1, 2005 - in fact defendant relies on it. Having the authority to decide when

---

[4] Defendant's counsel contends in his brief, page 1, that plaintiffs submitted their "contract bid prices" in May 2005. That contention is misleading because under SDDC's two-step rate filing system, initial rates were filed in May 2005 in the IF cycle but the operative rates were filed in the "me-too" rate filing in which TSPs file the rates at which they agree to service shipments awarded them during the procurement cycle. (Pl. Fact No. 2). The deadline for me-too rate filing for IW05 was July 28, 2005 and for DW05 was August 26, 2005. (Pl. Fact Nos. 6, 7). See Wilken Declaration ("When my company was making its rate filing decisions, particularly in the me-too cycle, we needed to know if the PowerTrack fee would continue to be reimbursed, since that is the actual rate we have to contend with for traffic movement.") (P1. App. 40).

the reimbursement would cease, it necessarily follows that Mr. Hicks had authority to extend the reimbursement until Families First became operative on the then scheduled date of February 1, 2006.

Neither of the two decisions cited in defendant's brief (pp. 10-11)[5] supports defendant's contention that Mr. Hicks' determination is not binding on the government. These decisions are factually inapposite since they do not involve the interpretation of a Federal Register Notice by the person who issued the Notice which is what is involved in the case at bar.[6]

Mr. Hicks' determination that the PowerTrack fee would be reimbursed until Families First became effective is consistent with prior advice given to TSP representatives. For example, at an SDDC meeting held in January 5, 2005, Mr. Hicks and Mr. Thomas advised that the reimbursement of the PowerTrack fee would continue until Families First was in effect. (Pl. Fact No. 9). In a letter to Joe Harrison, President of the American Moving and Storage Association (AMSA),

---

[5] Brunner v. United States, 70 Fed. Cl. 623 (2006); Dureiko v. United States, 62 Fed. Cl. 340 (2004).

[6] Defendant contends that Mr. Hicks' determination to continue reimbursement should not be given effect because the Federal Register Notice was "not retracted or superceded in a formal fashion." (Def. Br., p. 10). Defendant does not furnish any citation in support of this contention. In any event, plaintiffs' rights should not be affected by the failure of SDDC to comply with one of its requirements, even if it were one. Mr. Hicks had the authority to authorize continued reimbursement and plaintiffs were entitled to rely on that advice in their rate filings.

dated January 24, 2005, Col. Thomas Keller, then Deputy Chief of Staff for Passenger and Personal Property stated:[7]

> "...we believe the 1% surcharge fairly compensates industry until October 2005 when TSPs will be able to file rates in DPS." (Pl., App. 20). (Emphasis supplied).

In its response to an item presented at a military industry symposium, dated March 17, 2005, SDDC advised:

> "If PowerTrack is fully implemented in the middle of a rate cycle, TSPs will be reimbursed the 1% PowerTrack fee until Families First is rolled-out." (Pl. Supp. Fact. No. 31).[8] (Emphasis supplied).

That TSPs were consistently advised the PowerTrack fee would be reimbursed until DPS or Families First rolls out is confirmed by Mr. Thomas in his e-mail to Mr. Hicks, Donna Jack and other SDDC officials, dated November 16, 2005, where he states:

> "Donna, as you are aware, I was not part of nor do I agree to terminate the 1% TSP Fee. All along, we have told industry they will receive this fee until DPS rolls out. Now the battle has begun..." (P1. Supp. Fact. No. 32). (Emphasis supplied).

---

[7] Plaintiffs were advised that DPS was postponed until February 1, 2006 (Pl. App., 31, 58, 60); it has now been postponed until May 15, 2007.

[8] Whether PowerTrack is implemented in the middle of a rate cycle is irrelevant. The important thing is that Col. Keller, the then Deputy Chief of Staff for Passenger and Personal Property, who admittedly had contracting authority, advised that TSPs would continue to be reimbursed "until Families First is rolled-out." This advice was never contravened by defendant until after all rates had been filed. (SDDC message, dated October 31, 2005 (Pl. Fact No. 25).

Mr. Hicks' determination that the PowerTrack fee would be reimbursed until Families First became effective was also published as the official position of SDDC on SDDC's Web site to inform all TSPs of the continued reimbursement. (Pl. Fact. No. 16).[9]

2. Mr. Hicks' Position and Job Description

Mr. Hicks' official job description as Chief of SDDC's Personal Property Division also establishes his authority to determine that the PowerTrack fee would continue to be reimbursed. His official job description provides, inter alia:

> "...Develops personal property systems, policies and regulations in support of the MTMC [now SDDC] mission areas..."
> (Pl. Fact. No. 16).
>
> * * *
>
> "Incumbent's opinions and guidance are treated as if given by the DCSPPP [Deputy Chief of Staff for Passenger and Personal Property.]"
> (Pl. Supp. App. 6).
>
> "Develops the DCSPPP personal property organization in the MTMC's [now SDDC's] operational budget and exercises its delegated discretionary authority to manage, allocate and distribute funds. Incumbent is responsible for effective management of any contracts where organization has Contracting Officer Representative (COR) responsibility."

---

[9] Defendant's counsel incorrectly states in footnote 4 (Def. Brief., p. 10) that Mr. Thomas advised TSPs in his email of August 10, 2005 (Pl. App. 31) and in the SDDC Web site posting (Pl. App. 60) that "TSPs must include the PowerTrack fee in their rates that would take effect October 2005." Mr. Thomas stated "that all TSPs must factor this [the PowerTrack fee] into their rates for DPS so that when it does roll out, they will receive compensation." (Emphasis supplied). (Pl. App. 31, 60). DPS rates are yet to be filed due to SDDC's postponement. Mr. Thomas did not state, as defendant's counsel contends, that TSPs should factor the PowerTrack fee into their IW and DW rates. Further, SDDC's Web site specifically provides: "The TSP 1% reimbursement will continue for all TSPs participating in Phase I until DPS rolls out in February 2006."

* * *

> "... Prepares MTMC [now SDDC] interpretations of statutory, regulatory, contractual and procedural guidelines relating to the use of commercial and Defense transportation systems...Exercises authority to commit the command to agreements and makes final decisions..."

* * *

> "Provides MTMC [now SDDC] position on personal property transportation...issues to industry and DOD." (Pl. Supp. Fact. No. 33).

Mr. Hicks exercised this authority in his management of the PowerTrack program from its inception in June 2003. He issued all of the Federal Register Notices implementing the PowerTrack program, viz. the Notices, dated June 5, 2003 (68 Fed. Reg. 33683, et seq.), and September 29, 2003 (68 Fed. Reg. 55947 et seq., as well as the Notice, dated February 3, 2005. (Pl. Supp. Fact No. 27). These facts show that the PowerTrack program was under Mr. Hicks' management pursuant to his delegated authority and he was authorized to determine how long the reimbursement of the PowerTrack fee would continue.

Confirmation that Mr. Hicks, as Chief of the Personal Property Division, rather than the Deputy Chief of Staff for Passenger and Personal Property (DCSPPP), viz. Col. Keller and Col. Amato, had direct responsibility over reimbursement of the PowerTrack fee is established by a comparison of Mr. Hicks' job description, which is detailed in five pages, with the job description of the DCSPPP (Pl. Supp. App. 16) which is so truncated that it is only seven lines and

does not even mention the Personal Property Program. This makes clear that the running of the Personal Property Program was delegated to Mr. Hicks and the determination of when the use of PowerTrack should be mandatory and whether, and for how long the TSP is to be reimbursed for the PowerTrack fee, is a detail of the Personal Property program within the authority of Mr. Hicks. Plaintiffs' reliance on Tom Hicks' determination, conveyed by George Thomas, and published on SDDC's Web site, is fully justified under the case law.

Further, Mr. Hicks' job description made him directly accountable to the Deputy Chief of Staff for Passenger and Personal Property, Col. Amato, and required him to advise Col. Amato of "potentially controversial situations" such as the continued reimbursement of the PowerTrack fee. (Pl. Supp. Fact No. 34). For this reason, we maintain that knowledge that Mr. Hicks had authorized continued reimbursement of the PowerTrack fee should, as a matter of law, be imputed to Col. Amato. See Administration of Government Contracts, Cibinic and Nash, (3rd Ed) at p. 52:

> "...When the relationship between two persons creates a presumption that one would have informed the other of certain events the boards may input the knowledge of one to the other. Leiden Corp. ASBCA 20136, 83-2 BCA ¶16,612 recons. denied 84-1 BCA ¶16,947."

A case on point is Xplo Corporation, DOT BCA No. 1250, March 31, 1986, 86-2 BCA ¶18863, which held that knowledge of a contracting officer's representative, who did not have contracting authority, but had a duty to report

problems to the contracting officer, is to be imputed to the Contracting Officer and the resulting additional payment to the contractor cannot be set aside because of lack of contract authority. The Board stated:

> "The COTR, as the Contracting Officer's authorized representative had a duty to communicate appellant's notice of problems to the Contracting Officer and therefore knowledge of the differing site condition or change obtained by the COTR will be imputed to the Contracting Officer." (Citation omitted).

Under this principle, even if Mr. Hicks is found by the Court not to have contracting authority, knowledge that he continued the reimbursement of the PowerTrack fee is to be imputed to Col. Amato because Mr. Hicks had a duty to report "potentially controversial situations", such as continuation of reimbursement of the PowerTrack fee, to Col. Amato. (Pl. Supp. Fact No. 34). Therefore, even if Col. Amato was not informed of Mr. Hicks' determination to continue reimbursement of the PowerTrack fee,[10] knowledge of that determination is imputed to him as a matter of law and that decision is binding on the government.

3. The Law

It is well-settled law that the interpretation of a contract requirement, in this case the Federal Register Notice, by a government official responsible for advising contractors concerning contract requirements is given effect in construing the requirement even if the person making the interpretation did not himself have

[10] If Mr. Hicks did not inform Col. Amato of his determination to continue reimbursement of the PowerTrack fee, he would have deemed this to be a matter within the scope of his authority and not a "potentially controversial" matter.

contracting authority. This principle is clearly set forth in Max Drill, Inc. v. United States, 427 F.2d 1233 (Ct. Cl. 1970). In the Max Drill case, the contractor relied on the interpretation of a contract specification by the contracting officer's technical representative. The issue presented was whether the solicitation required the contractor to paint storm window sashes. The technical representative concurred in the contractor's interpretation that the painting of the window sashes was not required. After bids had been submitted, the contracting officer ordered the sashes to be painted and the question raised was whether this was a change in the contract for which the contractor was entitled to additional compensation. The Court found that, although the technical representative had no contracting authority, his interpretation of the specifications was reasonable and found that the contractor properly relied on his representation. The Court stated:

> "But it is not necessary to believe that Lt. Paynic had the authority to render binding contract interpretations in order to find for plaintiff here. Nor is it suggested that Lt. Paynic had the authority to issue major change orders in the contract, for no change was made by him…The statements of the Technical Representative cannot be completely disavowed and repudiated on the ground that he was without authority to speak for the contracting officer. General Casualty Co., supra. When an official of the contracting agency is not the contracting officer, but has been sent by the contracting officer for the express purpose of giving guidance in connection with the contract, the contractor is justified in relying on his representations. Fox Valley Eng'r, Inc. v. United States, 151 Ct. Cl 228, 240 (1960)." (427 F.2d at 1243) (Footnote omitted).

The analogy to the case at bar is striking. Defendant's Chief of SDDC's Personal Property Division, Mr. Hicks, advised Mr. Thomas that reimbursement of

the PowerTrack fee was to continue and knew that this advice was conveyed to TSPs by Mr. Thomas during the rate-filing process.[11] There is no question that Mr. Hicks was SDDC's representative on all matters involving the Personal Property Program. SDDC did not issue a contrary interpretation until October 31, 2005, well after the bids had been submitted. (Pl. Fact No. 25). The TSPs properly relied on Mr. Hicks' interpretation in preparing their bids.

In Gresham & Company, Inc. v. United States, 470 F.2d 542 (Ct. Cl. 1972), the government representatives of the contracting officer interpreted the specifications for dishwashers as not requiring automatic detergent dispensers. In an action by the contractor for additional compensation for supplying the dispensers as a contract change, the Court found that the interpretation of representatives of the contracting officer, who did not have contracting authority, was evidence of the reasonableness of the contractor's interpretation of the specifications. The Court stated:

> "…It is undisputed that the QUARs were skilled men in the commodity area and were expressly assigned to Gresham's plant to inspect and approve machines. Inspectors may not have had authority to supply a binding interpretation of the contract, but their actions constitute highly persuasive evidence of the reasonableness of plaintiff's interpretation.' See Kraus v. United States, 366 F.2d 975, 981, 177 Ct. Cl. 108, 118 (1966)." (470 F.2d at 552).

---

[11] See Declaration of Margaret (Peggy) Wilken (Pl. App. 39 et seq.); also SDDC does not challenge this but limits its position to the proposition that Mr. Thomas (and presumably Mr. Hicks) did not have contractual authority to bind SDDC.

We maintain that plaintiffs' claim for reimbursement is stronger than that involved in the Gresham case. Here the Chief of SDDC's Personal Property Division, Tom Hicks, determined that the reimbursement of the PowerTrack fee would continue, based on his consideration of the Federal Register Notice which he issued, and directed Mr. Thomas to convey that advice to TSPs, including plaintiffs. Further, Mr. Hicks' determination was published on SDDC's Web site as the official position of SDDC.

For all of the reasons stated above, we respectfully ask the Court to find that Mr. Hicks' action was within the scope of his authority and that plaintiffs are entitled to reimbursement of the PowerTrack fee until Families First becomes effective.

However, even should the Court find that Mr. Hicks did not have actual authority, it should find that he had implied actual authority to authorize the continued reimbursement of the PowerTrack fee under the criteria of H. Landau & Company v. United States, 886 F.2d 322, 324 (Fed. Cir. 1989), where the Court stated:

> " 'Authority to bind the [g]overnment is generally implied when such authority is considered an integral part of the duties assigned to a [g]overnment employee' J. Cibinic & R. Nash, *Formation of Government Contracts* 43 (1982); see also United States v. Bissett-Berman Corp., 481 F.2d 768-769 (9th Cir. 1973) (holding that the government's attorney had the implicit authority to bind the government although the CO had the expressed authority)".

In the Landau case, the Court found that two government officials who were not contracting officers, but who had responsibility to administer a subcontract, had implied actual authority to bind the government by guaranteeing payments in order to ensure performance of the subcontract. The standard of the Landau decision was applied in Telenor Satellite Service, Inc. v. United States, 71 Fed. Cl. 114 (2006), where the Court held that a State Department official had implied actual contract authority based on his job description and position within the agency's organization structure under which he was delegated responsibilities analogous to those of Mr. Hicks as SDDC's Chief of its Personal Property Division. The Court found that the State Department official "was responsible for overseeing the Bureau's major functions, including developing, managing and implementing" his agency's programs subject only to supervision by an Assistant Secretary of State.

Mr. Hicks' job description as Chief of the Personal Property Division, makes him responsible for "effective management of contracts", provides that his "opinions and guidance are treated as given by the DCSPPP [Deputy Chief of Staff for Passenger and Personal Property]," the official to whom he was accountable, and that he had delegated discretionary authority "to manage, allocate and distribute funds." We maintain that, like the official in the Telenor case, Mr. Hicks should be found to have had implied actual authority to authorize reimbursement of the PowerTrack fee based on his official responsibilities.

4. Col. Amato Should Be Found to Have Ratified Mr. Hicks' Determination to Continue Reimbursement of the PowerTrack Fee.

We further maintain for the reasons stated below that Colonel Amato had actual or constructive knowledge that TSPs were advised during the rate-filing process of Mr. Hicks' determination that the PowerTrack fee would continue to be reimbursed until DPS or Families First becomes effective and that by not timely countermanding this advice to TSPs, Col. Amato should be found to have ratified by acquiescence the continued reimbursement of the PowerTrack fee.

As the Deputy Chief of Staff, Col. Amato was the official responsible for the information published on SDDC's official Web site under the Department of Defense Web Site Administrative Policies and Procedures, which provide, inter alia:

> "3.1 DoD Component Heads and Heads of Subordinate Organizations that establish Web sites are responsible for instituting a process for the identification of information appropriate for posting to Web sites and the appropriate security and access controls. The steps of this process…include:
>
> * * *
>
> "3.1.6. Approval of the information for public release…"
>
> "3.2…careful examination of the potential consequences of placing information on the Web must be undertaken before it is made available."
>
> "3.5.1. Clearance Requirements for Publicly Accessible Web Site. Heads of DoD Components must establish…clearance review procedures for official DoD information that is prepared by or for DoD personnel and is proposed for posting to publicly accessible Web Sites."

> "3.8.1. A reasonable effort to validate the accuracy of the information [must be accomplished]." (Pl. Supp. Fact No. 36).

Pursuant to the above delegation responsibilities, Col. Amato had a duty to know the content of the information posted of SDDC's Web site. For this reason, Col. Amato should be found to have had constructive knowledge, if not actual knowledge, that TSPs were being advised that the PowerTrack fee would continue to be reimbursed.

Under the case law, where a contracting official, such as Col. Amato, has actual or constructive knowledge that a subordinate government representative has made a contractual decision on which the contractor relies and does nothing to countermand it, he is deemed to have ratified the action. This Court clearly set forth the rule in Dolmatch Group, Ltd., v. United States, 40 Fed. Cl. 431, 438 (1998):

> "When an unauthorized government representative enters into an agreement, the agreement may still be valid if ratified by a person with express or implied actual authority to bind the government... 'Ratification occurs when a ratifying official has actual or constructive knowledge of an unauthorized agreement, and expressly or impliedly adopts the agreement.'..." (Citations omitted).

This standard for ratification as stated in the Dolmatch decision, supra, was applied in Telenor Satellite Services, Inc. v. United States, supra, where the Court found ratification of a government contract by a State Department official who was informed of the contract by his subordinate.

The case law further holds that where, as in the case of Col. Amato, an official with contracting authority has actual or constructive knowledge of an agreement

entered into by his designated representative and does not timely repudiate or countermand the agreement he is deemed to have ratified it by inaction. As the Court stated in finding ratification in Williams v. United States, 127 F. Supp. 617, 623 (Ct. Cl. 1955):

> "It seems incredible that he [the contracting officer] did not know all about the agreement and by his inaction ratify it. Certainly, he did not repudiate the agreement."

We maintain Colonel Amato had constructive, if not actual knowledge, of the advice to TSPs that the PowerTrack fee would continue to be reimbursed until Families First became effective and that by doing nothing to timely countermand that advice,[12] he should be found to have ratified it by acquiescence. Under these circumstances, it would be manifestly inequitable to allow defendant to avoid the continued reimbursement promised to plaintiffs by the advice given to TSPs at the direction of SDDC's Chief of its Personal Property Division.

For the reasons stated above, we maintain that Tom Hicks, as SDDC's Chief of Personal Property, in which capacity he was the official responsible for the PowerTrack program and in which capacity he issued all the Federal Register Notices dealing with PowerTrack, had authority to make the determination to continue reimbursement of the PowerTrack fee. Alternatively, we maintain that Col.

---

[12] TSPs were advised that the PowerTrack fee would continue to be reimbursed by e-mails from Hicks' appointed representative, George Thomas, to TSPs and their representatives during June, July and August 2005 which culminated in the SDDC Web site posting in August. Col. Amato did not express any disagreement with that advice until two and a half months later, with the e-mail, dated October 31, 2005.

Amato should be found to have had knowledge of Mr. Hicks' determination that reimbursement of the PowerTrack fee should continue until Families First became effective and that by failing to timely countermand Mr. Hicks' advice which was communicated to all TSPs, including plaintiffs, he is deemed to have ratified Mr. Hicks' action.

## II. ALTERNATIVELY, THE AMBIGUITY ESTABLISHED BY THE CONFLICTING INTERPRETATIONS OF COLONEL AMATO AND MR. HICKS AS TO WHETHER SDDC WAS TO REIMBURSE THE POWERTRACK FEE DURING IW/DW05 SHOULD BE CONSTRUED AGAINST SDDC AS THE DRAFTER OF THE FEDERAL REGISTER NOTICE.

When SDDC postponed the effective date of Families First from the October 1, 2005 date, an ambiguity contained in the Federal Register Notice, dated February 3, 2005, became apparent as to whether the reimbursement of the PowerTrack fee would be cut off with the effective date of IW and DW05 or whether it would continue until DPS or Families First became effective. The ambiguity in the Federal Register Notice was created by the fact that postponement of Families First had changed the procurement scheme from the one set forth in the Federal Register Notice which called for the DPS rates and the IW05 and DW05 rates all to be filed with an effective date of October 1, 2005.[13]

---

13. However this did not occur since due to the postponement of Families First until February 1, 2006, the DPS rates were never filed. Since that time SDDC has further postponed DPS or Families First until May 2007, at the earliest.

The postponement of DPS created an ambiguity in the Federal Register Notice, viz. was reimbursement of the PowerTrack fee to continue until DPS was rolled out, as determined by Mr. Hicks, and as plaintiffs were advised, or was the reimbursement to cease with the filing of the IW05 and DW05 rates effective October 1 and November 1, 2005, as subsequently determined by Col. Amato?
To resolve this ambiguity, TSP representatives requested advice from George Thomas, the contact person identified in the Federal Register Notice, as to whether the reimbursement of the PowerTrack fee was to continue during IW and DW05 since, if not, TSPs would have to reflect the PowerTrack fee in their rates. Mr. Thomas, acting on Mr. Hicks' advice, repeatedly furnished advices to TSPs, with the full knowledge of Mr. Hicks, that the PowerTrack fee would continue to be reimbursed until Families First became effective. Colonel Amato's conflicting opinion was not communicated to TSPs until October 31, 2005 (Pl. Fact No. 25), well after the rate filings in both IW and DW05 had been completed.

We maintain that the construction by Mr. Hicks should be upheld by the Court. Mr. Hicks issued the Federal Register Notice as Chief of SDDC's Personal Property Division and was the SDDC official responsible for the PowerTrack program since its inception in June 2003. (See Federal Register Notices, dated June 5 and September 29, 2003 (Pl. Supp. App. 12-13 and 14-15) and February 3, 2005. (Pl. App. 70-71). Mr. Hicks and his designated representative, George Thomas, participated in numerous meetings with TSPs and their representatives and advised

them of matters concerning PowerTrack, including the reimbursement of the fee. (Pl. Fact No. 9).

On the other hand, during this period, the Deputy Chief of Staff for Passenger and Personal Property had changed. In June 2005, Col. Thomas Keller vacated the post and Col. Steven Amato did not assume that position until mid-July 2005. To our knowledge, Col. Amato never advised TSPs on PowerTrack matters until his e-mail, dated October 31, 2005. (Pl. Fact No. 25).

Since Mr. Hicks was designated to run SDDC's Personal Property program, including the implementation of PowerTrack, had years of experience as Chief of SDDC's Personal Property Division, and had issued all the Federal Register Notices relating to PowerTrack, including that of February 3, 2005, and Col. Amato was new to the job, we suggest that Mr. Hicks' opinion should be controlling. Further, as previously stated, Col. Amato's conflicting opinion was not communicated to the industry until months after the rates in IW and DW05 had been filed.

Even overlooking the lateness of the Amato interpretation of the Federal Register Notice, we maintain that the rule of contra proferentum[14] requires that the Federal Register Notice be construed against SDDC as the drafter[15] and that plaintiffs' claim for reimbursement of the PowerTrack fee should be upheld. As this

[14] The issue of "contract authority" is not involved in applying the doctrine of contra proferentum.

[15] The Federal Register Notice, dated February 3, 2005 is a document issued by SDDC. In signing the notice as Chief of the Personal Property Division, Tom Hicks was acting in his official capacity on behalf of SDDC.

Court stated in Sun Shipbuilding and Dry Dock Company v. United States, 393 F.2d 807, 816 (Ct. Cl. 1968):

> "It is the rule that where we have a contract that has been written by the government which is ambiguous, the ambiguity will be resolved against the drafter of the document (the government) and in favor of the other party...." (Citation omitted).

Another case on point is Neal & Co. v. United States, 19 Cl. Ct. 463 (1990), where the Court held that the government was required to reimburse plaintiff for costs it incurred which the government had contended should have been included in plaintiff's bid under the government's construction of the relevant provision of the contract. The Court based its finding of ambiguity in part on the fact that responsible Navy officials were uncertain as to the meaning of the provision. The Court stated:

> "...The uncertainty on the part of Navy personnel as to the meaning of 'steel liner' in Amendment 002 is evident from this statement, and buttressed by other trial testimony of Navy representatives. In this light, the disputed language was more than a 'disagreement among the parties,'....Surely, there was at least a 'reasonable uncertainty of meaning'..." (19 Cl. Ct. at 472) (Citations omitted).

We maintain that the matter presented to the Court is an a fortiori case since the SDDC representatives responsible for the PowerTrack program, Tom Hicks and George Thomas, both took the position that the PowerTrack fee should continue to be reimbursed until Families First became effective.

It would have been unreasonable for TSPs to have increased their rates to reflect the PowerTrack fee since at the time their bids were required to be submitted

a number of Army and Navy bases did not authorize PowerTrack billings and no Air Force bases authorize PowerTrack billings even at this date. (Pl. Fact No. 19). If TSPs had increased their rates to reflect the PowerTrack fee, they would be charging for service they did not perform when billing for shipments moving to or from non-PowerTrack military bases. (See Pl. Fact No. 19).[16] In a letter, dated January 24, 2005, to the President of the American Moving & Storage Association, of which many plaintiffs are members, Colonel Thomas Keller, SDDC's then Deputy Chief of Staff for Passenger and Personal Property, advised:

> "Until all sites…are participating [in PowerTrack] it would not be cost effective for [PowerTrack] charges to be included in the transportation rate." (Pl. Fact No. 18).

Under these circumstances, it would be unreasonable for plaintiffs to have increased their IW05 and DW05 rates to cover the PowerTrack fee knowing that the increased rates would unfairly apply to Air Force shipments and to other shipments which could not be billed by PowerTrack. This would be an absurd result because the government would then be charged for service which the TSPs did not provide.

Further, continued reimbursement of the PowerTrack fee was reasonable because in DW05 TSPs were prohibited from increasing their rates to include the PowerTrack fee by a rate cap imposed in the DW05 solicitation and by fixed charges for accessorial services contained in both the IW05 and DW05 solicitations. (Pl. Fact No. 20).

[16] The rate cannot be varied with the military service involved.

At no time during the rate-filing process for IW05 and DW05 did SDDC advise TSPs that it considered Mr. Hicks' decision communicated to TSPs by Mr. Thomas, viz. that the PowerTrack fee would be reimbursed until the roll-out of Families First, was incorrect or that Mr. Hicks did not have authority to bind SDDC. In fact, as late as October 20, 2005, nearly three months after the final IW05 rate filing, and two months after the final DW05 rate filing, SDDC officials gave conflicting advice to TSP representatives as to whether SDDC would continue to reimburse TSPs for the PowerTrack fee. (Pl. Fact No. 24). At one meeting, attended by at least 60 TSP representatives, an SDDC official advised that the reimbursement would continue and at another meeting, held on the same day, SDDC advised industry association representatives that the reimbursement would cease with IW05 and DW05. (Pl. Fact No. 24). It was not until October 31, 2005 that Colonel Amato wrote the TSPs and advised that reimbursement of the PowerTrack fee would stop prior to the effective date of Families First. (Pl. Fact No. 25).

We maintain that these conflicting interpretations reveal an ambiguity which, for the reasons stated above, is to be construed against SDDC, the drafter of the Federal Register Notice.

As the Court held in the Neal & Co. decision, supra, even should the Court find the government's construction of the ambiguous Federal Register Notice to be more reasonable than that advanced by plaintiffs, plaintiffs' construction should still prevail. In the Neal & Co. decision, the Court stated:

> "Plaintiff is not required to have construed the ambiguous provision in a more reasonable manner than did defendant. Rather, if 'the contractor follows an interpretation that is reasonable, this interpretation will prevail over one advanced by the Government, even though the Government's interpretation may be a more reasonable one since the Government drafted the contract.' Union Pacific Ins. Co. v. United States, 497 F.2d 1402, 204 Ct. Cl. 686 (1974)." (19 Cl. Ct. at, 473).

In this case, the Chief of SDDC's Personal Property Division's construction of the Federal Register Notice after SDDC's postponement of Families First, which is shared by plaintiffs, is reasonable and should prevail.

III. EVEN SHOULD THE COURT HOLD THAT MR. HICKS' INTERPRETATION OF THE FEDERAL REGISTER NOTICE IS WITHOUT LEGAL EFFECT, TSPS ARE FREE FROM THE REQUIREMENT TO USE POWERTRACK WITHOUT REIMBURSEMENT BECAUSE OF DEFENDANT'S FAILURE TO MAKE FAMILIES FIRST EFFECTIVE ON OCTOBER 1, 2005.

As shown above, the Federal Register Notice provided that Families First or DPS was to become effective on October 1, 2005, when the procurement involved: (a) would be converted from a cost-driven procurement to one where shipments would be awarded on the basis of "best value" (70 percent performance, 30 percent cost) (P1. Fact No. 3); (b) the rates filed in IW and DW05 would be back-up rates to be applied only if Families First were to be terminated (P1. Fact No. 5); (c) all rates (IW05, DW05 and DPS) were to be filed to be effective on October 1, 2005. (P1. Fact No. 5). However, defendant defaulted on its obligations contained in the Notice

by postponing DPS and the best value procurement to February 1, 2006.[17]

Therefore, even if we assume, arguendo, that the Notice is interpreted to mean that TSPs were required to use PowerTrack without fee reimbursement, TSPs are relieved of that obligation because defendant defaulted on its obligation to make Families First, the best value procurement, effective on October 1, 2005.

It is a fundamental principle of contract law that where one party to a contract (here SDDC) finds it impossible or impractical to perform a promised act (here implementing the Families First best value procurement on October 1, 2005) by a supervening event, not foreseen at the time the agreement was made, the other party is relieved from its obligations under the contract. This principle is set forth in 13 Corbin on Contracts, §68.4 (3) (a) (2003) as follows:

> "In a bilateral contract for an exchange of equivalent performances that are concurrently conditional, if supervening events make it impossible or impracticable for one of the parties to render substantial performance of its promise, two effects are at once produced. The other party is justified in not performing the return performance by failure of consideration...." (Footnote omitted).

This principle is applicable to defendant's contention that plaintiffs were obligated to include the PowerTrack fee in their IW/DW05 rates by reason of the Federal Register Notice. Plaintiffs' obligation was conditioned upon SDDC's promise that DPS or Families First would go into effect on October 1, 2005. Defendant defaulted on this obligation by postponing this event until February 1,

[17] The IW and DW05 were converted from back-up rates to the only rates to be offered and the DW05 procurement was rescheduled to begin November 1, instead of October 1 as set forth in the Federal Register Notice.

2006.[18] This relieved TSPs of any obligation they might have had under the Federal Register Notice to use PowerTrack without continued reimbursement of the PowerTrack fee.

Although defendant's action discharged plaintiffs from their obligation to use PowerTrack without fee reimbursement, it did not eliminate defendant's requirement that PowerTrack be used. Defendant's requirement that TSPs use PowerTrack after October 1, 2005 gives rise to a claim for reimbursement founded on quantum meruit.

## IV. SHOULD THE COURT HOLD THAT SDDC IS NOT BOUND BY MR. HICKS' INTERPRETATION OF HIS FEDERAL REGISTER NOTICE OF FEBRUARY 3, 2005, PLAINTIFFS ARE ENTITLED TO QUANTUM MERUIT COMPENSATION FOR THEIR REQUIRED POWERTRACK BILLINGS.

As set forth in our Motion for Summary Judgment (pp. 19-23), in any government procurement the rights of the parties are determined by the solicitation. In the case at bar the requirement that TSPs bill by PowerTrack without reimbursement was not included in the IW05 solicitation until October 3, 2005, three days after IW05 had begun. (Pl. Fact No. 22) and three months after plaintiffs' final rates were required to be submitted. (Pl. Fact No. 23). Similarly, in DW05, the solicitation covering the PowerTrack billing was not added to the solicitation until Change 3, created in November 30, 2005, again three months after plaintiffs' final rates were required to be filed.

---

[18] Now postponed at least until May 2007.

Although we cited a number of cases in which quantum meruit recovery was ordered by this Court involving the predecessor of SDDC and this same military Personal Property program, defendant states that quantum meruit compensation should be denied because "the use of PowerTrack was not an unanticipated change." (Defendant's Brief, p. 12). However, the touchstone to recovery in quantum meruit in government contracts is not predicated on something as indefinite as "anticipation"; it is based upon whether the service demanded by the government is set forth in the governing solicitation.[19] Applying that test to the case at bar, plaintiffs are entitled to quantum meruit compensation even should the Court reject the determination of the Chief of SDDC's Personal Property Division that plaintiffs' payment of the PowerTrack fee should be reimbursed.

## CONCLUSION

For the above reasons and those stated in the Memorandum filed in support of plaintiffs' Motion for Summary Judgment, we maintain that SDDC is obligated to reimburse plaintiffs for the PowerTrack fees paid during the traffic cycles IW05 and DW05, October 1, 2005 through March 31, 2006 and November 1, 2005 through April 30, 2006, respectively, and for the additional costs they incurred in billing by PowerTrack and respectfully request that the Court grant summary judgment on the issue of liability in plaintiffs' favor and deny defendant's motion for summary judgment on this issue.

---

[19] The government apparently recognizes the need to add such a provision to the solicitation since it did so in IW05 although after the fact.

Respectfully submitted,

s/Alan F. Wohlstetter
ALAN F. WOHLSTETTER
DENNING & WOHLSTETTER
815 Connecticut Avenue, N.W.
Suite 500
Washington, D.C. 20006
Tel: (202) 833-8884
Fax: (202) 833-8886
Attorney for Plaintiffs

STANLEY I. GOLDMAN
DENNING & WOHLSTETTER
Of Counsel

November 6, 2006