IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| STEVENS VAN LINES, INC., ET AL., Plaintiffs | |
| v. | No. 05-1278C (Judge Smith) |
| THE UNITED STATES, Defendant | |

# PLAINTIFFS' SUPPLEMENTAL APPENDIX

ALAN F. WOHLSTETTER
DENNING & WOHLSTETTER
815 Connecticut Avenue, N.W.
Suite 500
Washington, D.C. 20006
Tel: (202) 833-8884
Fax: (202) 833-8886
Attorney for Plaintiffs

STANLEY I. GOLDMAN
DENNING & WOHLSTETTER
Of Counsel

November 6, 2006

# PLAINTIFFS' SUPPLEMENTAL APPENDIX


1. Defendant's Responses to Plaintiffs' Interrogatories Nos. 11, 12, 13.... 1

2. SDDC's Response to Military/Industry Symposium Item re PowerTrack – March 17, 2005 .... 4

3. E-mail, dated November 16, 2005, from George Thomas to Tom Hicks, et. al .... 5

4. Tom Hicks, Chief of Personal Property Division – Job Description .... 6

5. Federal Register Notice, 68 Fed. Reg. 33683, et seq., June 5, 2003 .... 12

6. Federal Register Notice, 68 Fed. Reg. 55947, et seq., September 29, 2003 .... 14

7. Colonel Steven L. Amato, Deputy Chief of Staff for Passenger and Personal Property – Job Description .... 16

8. Department of Defense Web site Administrative Policies and Procedures, Part II.3. Information Posting Process .... 17

Identify each document by which SDDC, or an officer or employee of SDDC, advised TSPs or their representatives that the PowerTrack fee would continue to be reimbursed during Phase I of Families First, including IW05 and DW05, i.e. until DPS rates or Families First Phase II became effective.

RESPONSE:

No such officially-authorized communications were made. Plaintiffs are in possession of the emails from Mr. George Thomas dated June 30, 2005 and August 10, 2005. All other documents or communications between SDDC and TSPs or their representatives is provided in response to plaintiff's request for production of documents.

INTERROGATORY NO. 10:

Identify George Thomas's present and former supervisors at SDDC relating to matters involving PowerTrack, including reimbursement of the PowerTrack fee.

RESPONSE:

Mr. Thomas's present and formers superiors at SDDC relating to matters involving PowerTrack including reimbursement of the PowerTrack fee are the same individuals identified in response to interrogatory number 1.

INTERROGATORY NO. 11:

Identify all communications from or to George Thomas and the person or persons identified in response to Interrogatory No. 10 above, relating to reimbursement or non-reimbursement of the PowerTrack fee to TSPs and state whether the communication was written or oral, the date of each such communication and describe in detail what was discussed in each communication.

RESPONSE:

Mr. Thomas recalls being informed by Mr. Hicks through

several verbal communications that the one percent PowerTrack fee would be reimbursed to TSP until DPS rolls out. Mr. Thomas recalls these communications being made around the time of the June 2005 and August 2005 emails identified in Interrogatory No. 12.

INTERROGATORY NO. 12:

Identify each officer or employee of SDDC who had knowledge of the content of George Thomas's e-mails (a) dated August 10, 2005 to Scott Michael (Pl. App. 31); (b) dated June 30, 2005, to Charles L. White (Pl. App.57), and (c) dated July 29, 2005 to Sue Fuchtman (Pl. App. 66) and of Steven Savage's e-mail dated June 7, 2005 to Scott Michael (Pl. App. 29).

RESPONSE:

All senior officers in the Passenger and Personal Property Directorate of SDDC eventually became aware of the emails identified in interrogatory number 12. The individuals with contemporaneous knowledge of the emails are identified in the "to" and "cc" lines of the emails. In addition to those individuals, Steffen Frey, Steve Savage and Tom Hicks also had contemporaneous knowledge.

INTERROGATORY NO. 13:

Identify each officer or employee of SDDC involved in or who had knowledge of the SDDC Web site posting of August 2005:

> "How long will the government reimburse the Carriers the 1% PowerTrack fee: The TSP 1% reimbursement fee will continue for all TSPs participating in Phase I until DPS rolls out in February 2006. Please note that all TSPs must factor this into their rates for DPS so that when it does roll out, they will receive compensation. However for now and during the remaining time of Phase I, TSP's will bill the 1% fee the same

way they are now. Reimbursement for the 1% fee the same way they are now. Reimbursement for the 1% fee will cease when DPS rolls out." (Pl. App. 60).

RESPONSE:

Steffen Frey, Steve Savage and Tom Hicks.

INTERROGATORY NO. 14:

State the meaning of "Phase I" and "DPS" in the following sentence contained on SDDC's Web site posting of August 2005, viz, re "The TSP 1% reimbursement will continue for all TSPs participating in Phase I until DPS rolls out in February 2006." (Pl. App. 60).

RESPONSE:

Phase I is the first phase of the Families First Program. It implements the Electronic Billing and Payment of Personal Property invoices in the current Personal Property Program using the Central Web Application. "DPS" is the Defense Personal Property System. This is a web-based system intended to replace the TOPS system.

INTERROGATORY NO. 15:

State the total amount of PowerTrack fees received by U.S. Bank from each plaintiff for billings for IW05 to the date of defendant's response to these interrogatories.

RESPONSE:

Objection. The only fees that are relevant to this lawsuit are those that were billed during the domestic and international winter time periods. For that reason, a summary of billing and powertrack fees during the relevant time period (October 5, 2005,

**ITEM:** 360

**PROPONENT:** Household Goods Forwarders Association of America

**STAFF PROPONENT:** Program Development Branch

**SUBJECT:** PowerTrack

**INITIATED:** January 12, 2005

**DISCUSSION:** There is a great deal of information being circulated concerning PowerTrack. A number of major questions have surfaced with respect to this information:

1) When does SDDC foresee the worldwide implementation of PowerTrack?
2) When will PowerTrack become mandatory for all participants in the DOD program? Specifically, will PowerTrack become mandatory before the start of Phase 2 of Families First or will it coincide with the rollout of Phase 2?

Finally, if PowerTrack is fully implemented in the middle of a rate cycle how will SDDC allow carriers to recover the 1% PowerTrack fee that they were not able to add into their rate?

**RECOMMENDATION:** A full briefing, at the M/I, on the timeline for implementation of PowerTrack will help clear up all questions that carriers may have. It is also recommended that if PowerTrack is implemented in the middle of a rate cycle then the pass through charge that is currently in place during Phase 1 be continued.

**RESPONSE:** **17 Mar 2005. SDDC foresees the worldwide implementation of PowerTrack in June of 2005. PowerTrack will become mandatory before the start of Phase 2 of Families First. If PowerTrack is fully implemented in the middle of a rate cycle, TSPs will be reimbursed the 1% PowerTrack fee until Families First is rolled-out. Please refer to the American Moving and Storage Association letter dated January 24, 2005 and Household Goods Forwarders Association of America letter dated February 15, 2005. There will be a Financial Supply Chain Conference sponsored by U.S. bank on May 3 - 5 2005 in San Diego, CA with discussion on PowerTrack. SDDC will participate in this Conference.**

**SUMMARY:** **17 Mar 2005. Per Industry request, please visit the URL below.**

**http://www.sddc.army.mil/frontDoor/0,1865,OID=4--7319-13144--13144,00.html**

**ESTIMATED CLOSURE:** Closed 17 Mar 2005

**Thomas, George**

| | |
|---|---|
| **m:** | Thomas, George |
| **nt:** | Wednesday, November 16, 2005 9:43 AM |
| **o:** | Hicks, Thomas; Jack, Donna; Williams, Dennis |
| **Cc:** | Dabo, C. J.; John J Luik (E-mail) |
| **Subject:** | The draft reply ltr to HHGFAA/AMSA on the 1% PowerTrack surcharge |
| **Attachments:** | HGFAA-AMSA reply Nov 14.doc; RE TSP Participation in Families First Phase I Program.txt; 2.pdf; 1.pdf; RE 1% fee.htm |

HGFAA-AMSA reply Nov 14.doc (7... RE TSP Participation in Famili... 2.pdf (209 KB) 1.pdf (215 KB) RE 1% fee.htm (16 KB)

Donna, as you are aware, I was not part of nor do I agree with the decision to terminate the 1% TSP Fee. All along, we have told industry they will receive this fee until DPS rolls out. Now, the battle has begun.

Anyway, I have not received or reviewed the letters from AMSA or HHGFAA. Based on Bill's draft response, here is my input.

Phase I is implementing PowerTrack in the current Personal Property Program. It did-not close in August 04, based on the 3 Feb 05 Federal Register Notice, the Evaluation Period on Phase I ran from 29 Mar 04 through 22 September 04. We then moved from the Evaluation Period to the Implementation Phase using a date of 30 June have all TSPs and PPSO on board. We have implemented 100% of the TSPs and all PPSOs less US Air ce. Phase I will continue until Phase II (DPS) rolls out. Date yet to be determined.

As part of the 29 Sep 03 Federal Register Notice, (Responding to Industry Comments to the 5 Jun 03 FRN) Then MTMC informed industry that all TSPs participating as volunteers would receive compensation in the form of a percentage adjustment similar in kind to the Fuel Surcharge.

Rest of my comments are noted in Bill's draft below annotated in Blue. Have also attached documents he requested. Open issues remains for Rates to answer.

George

-----Original Message-----
From: Jack, Donna
Sent: Wednesday, November 16, 2005 7:12 AM
To: Williams, Dennis; Thomas, George
Cc: Hicks, Thomas
Subject: Fw: the draft reply ltr to HHGFAA/AMSA on the 1% PowerTrack surcharge

Dennis/George. Can you two please provide answers to Bills questions attached. *Tom would like to review* before giving to Bill. If you need additional input from Bill go ahead and get it. I would like to have a draft response by tomorrow. Thanks donna

--------------------

t from my BlackBerry Wireless Handheld

# Position Description

**PD#:** HT124996
**Sequence#:** VARIES

**Replaces PD#:**

## TRAFFIC MANAGER

**GS-2130-15**

**Installation:** PERSONNEL AND EMP PENTAGON, DC

**Major Command:** VARIES
**Region:** NATIONAL CAPITAL

**Citation 1:** OPM PCS TRAFFIC MGMT SERIES, GS-2130, JUL 91

**PD Library PD:** NO
**COREDOC PD:** NO

**Classified By:**
**Classified Date:**

**FLSA:** EXEMPT
**Career Program:** 24
**Functional Code:** 00
**Competitive Area:** VARIES
**Competitive Level:** VARIES

**Drug Test Required:** VARIES
**Financial Disclosure Required:** YES
**Requires Access to Firearms:** VARIES
**Position Sensitivity:** VARIES
**Emergency Essential:** VARIES

**DCIPS PD:** NO
**Acquisition Position:** NO
**Interdisciplinary:** NO
**Target Grade/FPL:** 15
**Career Ladder PD:** NO

**PD Status:** NOT REVIEWED

**Duties:**

**The duties of this position require specific leadership training:**

**-Sustaining Base Leadership Management (SBLM) course at AMSC.**

**-Senior Service College (SSC).**

**-Defense Leadership & Management Program (DLAMP).**

Serves as the Chief of Personal Property Division in the Office of the Deputy Chief of Staff for Passenger and Personal Property (DCSPPP). This organization exercises staff supervision and management control over all DOD personal property transportation. Develops personal property systems, policies, and regulations in support of the MTMC mission areas, identifies and or devises and incorporates new personal property management practices and methods, and processes. Policies and planned strategies must cover range of services offered by over 1,300 commercial firms expending over $1 billion moving over 600,000 personal property shipments. Incumbent?s opinions and guidance are treated as if given by the DCSPPP. Directs through subordinate

supervisors and team/project leaders who guide and control work, a sizeable work operation involving employees engaged in professional, technical or administrative work.

**Evaluation:**

1. Planning, Direction, Coordination, Evaluation and Organization. 30%

In consultation with subordinate supervisors, oversees and plans overall work operations, provides direction and broadly defines missions, requirements, sets priorities and establishes objectives for the DCSPPP personal property mission. Makes decisions on work problems presented by subordinates. Collaborates with chiefs of other activities to negotiate, decide on, and coordinate work-related changes affecting other transportation activities. Advises higher-level management officials on problems involving the relationships of the operations supervised to broader programs and their impact on such programs. Develops long-range program goals and objectives for the Division involving work planning, scheduling, and execution. Evaluates the effectiveness of operations supervised in terms of mission accomplishment, quality and quantity of standards, procedural, policy and regulatory compliance, and technical competence and revises the goals, objectives, and plans as necessary. Participates with the DCSPPP and Command Group in determining organizational structure, changes, and functions to be performed. Develops the DCSPPP personal property organization to the MTMC?s operational budget and exercises delegated discretionary authority to manage, allocate and distribute funds. Incumbent is responsible for effective management of any contracts where organization has Contracting Officer Representative (COR) responsibility.

Represents MTMC, USTRANSCOM, and DA/DOD on personal property movement and storage services and directorate information matters at interagency and transportation industry conferences and congressional hearings. Evaluates the significance or impact of personal property program legislation with consideration of overall DOD programs. Prepares MTMC interpretations of statutory, regulatory, contractual and procedural guidelines relating to the use of commercial and Defense transportation systems. Provides authoritative information to committees concerned with federal regulations on traffic management, government relationships with commercial carriers, and relationships between MTMC and other military departments and government agencies. Provides MTMC position on personal property transportation and traffic management efficiency issues to industry and DOD. Participates and/or chairs MTMC personal property carrier review boards. Exercises authority to commit the command to agreements and makes final decisions, or participates with the command group in final decisions, having a direct effect on mission accomplishment.

Provides leadership to the DCSPPP personal property, information management and administrative staff in improving the processes and procedures that enhance the effectiveness, efficiency, and productivity of all DCSPPP?s programs. Reviews and analyzes personal property movement programs within the civilian sector to include supporting systems, applying modern data automation techniques to capitalize on cutting edge technology to ascertain viability of use within DOD. Identifies and integrates a wide variety of factors affecting commercial movement of DOD personal property, e.g. carrier/vendor approvals, carrier/vendor performance, best value process, legislation involving the transportation industry, government (federal, state and foreign) regulations affecting movement of DOD personal property, and USTRANSCOM CINC initiatives.

2. Personnel Management Responsibilities. 25%

Evaluates overall performance of subordinate supervisors and reviews performance of all other individuals. Provides advice, counsel, and instruction to accomplish the assigned function. Interviews and makes selections of candidates for vacant positions. Knowledgeable of union contract bylaws and management responsibilities. Notifies appropriate union(s) of actions that affect policy, practice, or working conditions. Hears individual and group grievances and serious

Note: The Incumbent is required to comply with the standards of conduct provision of AR600-50 and is further required to file a current and annual DD Form 1555 statement of affiliations and Financial Interests.

FACTOR 1. PROGRAM SCOPE & EFFECT, LEVEL 1-4 -- 775 PTS

MTMC is a jointly staffed major Army Command under the U.S. Transportation Command. Through MTMC, the Secretary of the Army discharges his/her responsibilities as the Department of Defense (DOD) single manager for surface traffic management. The diverse functions that comprise the DCSPPP are considered to be a complex administrative program, which involves the development of major aspects of this key DOD-wide program. As chief of the Personal Property Program directs the Transportation and Traffic Management program for all personal property programs involving establishing services for over 600 thousand personal property shipments worldwide with over 1300 carriers/companies throughout the world. This involves the conduct of highly technical and administrative work in the development of policies and procedures for the management and procurement of personal property services.

Deals with extremely broad and complex transportation problems including the review of invitations for bid/requests for proposal, awarded contracts and contract modifications, developing and providing appropriate transportation provisions, contract clauses and delivery terms, transportation appropriations, rates, contract evaluations, transportation/distribution plans, evaluation, review and planning and movement supporting the military service worldwide requirements.

Through subordinate supervisors and team leaders, ensures that a broad knowledge of transportation and traffic management principles and factors are applied relative to all aspects of Personal Property Program Management.

EFFECT. The work that incumbent directs facilitates the safe and secure movement of units, personal property and materiel in not only the Department of the Army but the other DOD services and Coast Guard as well.

FACTOR 2. ORGANIZATIONAL SETTING, LEVEL 2-2 -- 250 PTS

The incumbent is accountable to the Deputy Chief of Staff for Passenger and Personal Property who is one reporting level below the first SES or general officer in the direct supervisory chain.

FACTOR 3. SUPERVISORY AND MANAGERIAL AUTHORITY EXERCISED, LEVEL 3-4B -- 900 PTS

Except for employee removals for discipline/performance reasons and incentive awards above set dollar levels, exercises final authority for the full range of personnel actions. The Commander has delegated to the incumbent the authority to approve most significant organization design proposals recommended by subordinate supervisors. For example, the incumbent can approve the establishment of additional branches in his/her area of responsibility. Utilizing superior management techniques and skills, assigns responsibilities and defines overall objectives. Responsible for the execution of administrative personnel management functions related to the completion of the assigned mission. Plans organization structure and staffing needs, interprets policies and regulations in relation to overall objectives. Potentially controversial situations are reviewed and communicated to appropriate parties. Exercises full supervisory authorities and responsibilities. These authorities include directing, coordinating and overseeing work of subordinate supervisors and non-supervisory personnel; advises management officials of higher rank; assures equity of performance standards developed by subordinate supervisors; makes decisions on work problems presented by such subordinate supervisors, evaluates subordinate supervisors; makes selection for subordinate supervisors; hears and resolves employee grievances

or complaints, with appropriate involvement of representation; promotes team building and improves overall business practices/work operations. Ensures timely development of management studies, program reviews, and other special projects in accordance with Department of Defense and Federal regulations and industry rules and practices. Provides advice and counsel?s subordinate employee?s relative to work and administrative matters.

SUBFACTOR 4A. PERSONAL CONTACTS AND NATURE OF CONTACTS, LEVEL 4A-3 -- 75 PTS

Frequent contact with high-ranking military/civilian managers at bureau and agency levels. Contacts include management and technical personnel in Headquarters, MTMC; officials and staff representatives of state, Federal and foreign governments; representatives of DOD organizations; international port authority staff; and executive level contracting and management officials of commercial transportation industry organizations. Contacts occur in scheduled and unscheduled meetings requiring incumbent?s technical familiarity with complex domestic and international traffic management and contracting issues.

SUBFACTOR 4B. PURPOSE OF CONTACTS, LEVEL 4B-3 -- 100 PTS

Purpose of contacts is to influence, motivate, and persuade persons or groups to accept the position or take actions related to, impacted by or change effected through transportation and traffic management and related logistical discipline issues, programs, recommendations, and plans that may include either the commitment of major resources or impacts to local, command or service policies, procedures, manuals, directives, regulations, developing new and innovative solutions to problem areas, and in gaining compliance with established policies, regulations or contracts. Contacts may involve intense opposition or resistance due to organizational or philosophical conflict, competing objectives, major resource limitations or reductions, or comparable issues. Persons contacted may be sufficiently fearful, skeptical, or uncooperative and require highly developed communication, negotiation, conflict resolution, leadership and similar skills to meet expected results.

FACTOR 5. DIFFICULTY OF TYPICAL WORK DIRECTED, LEVEL 5-7 -- 930 PTS

The highest level of base work directed is GS-12. The work requires excellent management techniques and skills, substantial breadth and depth of analysis of DOD personal property and POV shipment and storage services, as well as the commercial moving industry. Makes analytical assignments that are related to the development, revision and implementation of such program for DOD. Considers a wide range of complex issues that impact the programs such as technology changes, innovation and legal decisions. The work involves developing and recommending courses of actions and milestones for the plans to competitively procure moving services worldwide to include formulating and recommending DOD policy and procedures. Develops budgets and financial needs to present to the Command and Services in a timely manner to allow sufficient time for budgeting process to ensure adequate funding is available for critical services.

FACTOR 6. OTHER CONDITIONS LEVEL 6-5B -- 1225 PTS

Through subordinate supervisors, the incumbent directs work that requires extensive coordination and integration of a number of important program segments whose nonsupervisory work is comparable in difficulty to the GS-12 level. Makes major recommendations to the DCSPPP that have a direct and substantial effect on the organization and projects managed. For example, recommendations include areas such as the following: projects to be initiated or curtailed; changes in organizational structure; automated processes or improved methods to introduce into the workplace; etc.

TOTAL POINTS = 4255 PTS

CONVERSION POINTS OVER 4055=GS-15

Panel on its Web site at *http://www.rand.org/organization/nsrd/terrpanel;* it can also be reached at (703) 413–1100 extension 5683.

SUPPLEMENTARY INFORMATION:

Proposed Schedule and Agenda

Panel to Assess the Capabilities for Domestic Response to Terrorist Attacks Involving Weapons of Mass Destruction will meet from 11 a.m. to 5 p.m. on June 16, 2003 and from 8:30 a.m. until 3 p.m. on June 17, 2003. Time will be allocated for public comments by individuals or organizations at the end of the meeting on June 17th. Public comment presentations will be limited to two minutes each and must be provided in writing prior to the meeting. Mail written presentations and requests to register to attend the open public session to: Hillary Peck, RAND, 1200 South Hayes Street, Arlington, VA 22202–5050. Public seating for this meeting is limited, and is available on a first-come, first-served basis.

Dated: May 29, 2003.

**Patricia L. Toppings,**

*Alternate OSD Federal Register Liaison Officer, Department of Defense.*

[FR Doc. 03–14147 Filed 6–4–03; 8:45 am]

BILLING CODE 5001–08–M

## DEPARTMENT OF DEFENSE

### Office of the Secretary

### Defense Science Board; Notice of Advisory Committee Meeting

AGENCY: Department of Defense.

ACTION: Notice of Advisory Committee Meeting.

SUMMARY: The Defense Science Board Task Force on the Smallpox Vaccine Down Select Process will meet in closed session on July 24, 2003, in Washington, DC. The Task Force will perform an independent evaluation of the Department of Defense and Department of Health and Human Services smallpox vaccine candidates.

The mission of the Defense Science Board is to advise the Secretary of Defense and the Under Secretary of Defense for Acquisition, Technology & Logistics on scientific and technical matters as they affect the perceived needs of the Department of Defense. At this meeting, the Task Force will evaluate each of the smallpox vaccine candidates to include the following type of issues: choice of cell line and viral strain used; preclinical data in appropriate animal models; review of vaccine production methodology to include rates of production and surge capacity; review of protocols for clinical trials to include adverse reaction rates; review of cost issues as they relate to production of the vaccine; review of critical regulatory issues associated with the use of the vaccine; and any other issues that the Task Force feels, based on its experience, are relevant.

In accordance with Section 10(d) of the Federal Advisory Committee Act, Pub. L. 92–463, as amended (5 U.S.C. App. II), it has been determined that this Defense Science Board Task Force meeting concerns matters listed in 5 U.S.C. § 552b(c)(4) and that, accordingly, the meeting will be closed to the public.

Dated: May 29, 2003.

**Patricia Toppings,**

*Alternate OSD Federal Register Liaison Officer, Department of Defense.*

[FR Doc. 03–14146 Filed 6–4–03; 8:45 am]

BILLING CODE 5001–08–M

## DEPARTMENT OF DEFENSE

### Department of the Army

### Proposed Mandatory Use of USBank's PowerTrack System by Department of Defense Personal Property Transportation Service Providers

AGENCY: Department of the Army, DOD.

ACTION: Notice.

SUMMARY: The Military Traffic Management Command (MTMC), as the Department of Defense (DOD) Traffic Manager for the Household Goods and Personal Property Program, proposes the mandatory use of USBank's PowerTrack System as the transaction and payment system for all DOD Transportation Service Providers (TSP), beginning with the implementation of Phase I of the Defense Future Personal Property Program, (Families First). Furthermore, the use of MTMC's Centralized Web Application (CWA) will also be mandatory. Implementation of PowerTrack at all Military Services and Coast Guard installations is the goal of Families First, which is the first stop in moving toward the reengineered Personal Property Program of the future.

This announcement is being made to afford TSPs ample time to comment and plan for potential future data feeds to PowerTrack. The Electronic Billing and Payment portion of the Families First Web site is located at *http://www.mtmc.army.mil,* under the Personal Property Program. The site offers industry access to updates on the Business Rules, Concept of Operations (CONOPS), and System Interface Specifications.

DATES: The initial rollout of PowerTrack and CWA is proposed to begin October 1, 2003. Comments must be submitted on or before 30 days from publication.

ADDRESSES: Comments may be sent by e-mail to: *thomasg@mtmc.army.mil;* or by courier to: Headquarters, Military Traffic Management Command, ATTN: MTPP–PD, Room 10N35–58 (George Thomas), Hoffman Building II, 200 Stovall Street, Alexandria, VA 22332–5000.

FOR FURTHER INFORMATION CONTACT: Mr. George Thomas at (703) 428–2237.

SUPPLEMENTARY INFORMATION: The initial rollout (*see* DATES) is proposed to serve as the Evaluation Period for the Phase I process, and involve a limited number of Personal Property Shipping Office's (PPSO) and TSP's. Expansion to the remaining PPSO's and TSP's is proposed to commerce on or about April 2004. It is important to note that not all PPSO's will be impacted during the Evaluation Period. For this reason, TSPs should file their rates for the Winter Cycle assuming that PowerTrack and CWA will not be used.

Transportation Providers wishing to transport personal property shipments for the DOD must have an agreement with USBank and be PowerTrack certified for the electronic payment of commercial transportation services. It is important that TPs begin the PowerTrack signup process by calling USBank at 1–800–417–1844. Additional information on PowerTrack is available at *http://www.usbank.com/powertrack.* Only those TPs that are PowerTrack certified will be eligible to receive personal property shipments.

**I. Background**

On 7 July 1997, the Under Secretary of Defense (Comptroller) issued a memorandum, which required the reengineering of defense transportation documentation and financial processes as part of an effort to revolutionize DOD business practices across all Military Services and Agencies. A major component of the reengineering effort is the implementation of USBank's PowerTrack System. Powertrack has been implemented for DOD freight shipments for all modes of transportation and now is under consideration for DOD personal property shipments. In June 2002, the USTRANSCOM Personal Property report was released, and USTRANSCOM directed that work begin on the future Personal Property program. USTRANSCOM tasked MTMC, in conjunction with the Military Services and Industry, to map our

Families First by August 31, 2002. As a part of the Families First effort, DOD declared that PowerTrack would be utilized as the commercial business-to-business payment system.

To begin moving forward with Families First, MTMC developed a CONOPS outlining the implementation of Phase I. Key elements of Phase I CONOPS are electronic bill payment and the CWA. The CWA will be used for approval authorization and for costing shipments, based on the current Military Rate Tender.

## II. Objective

The objective of Phase I is to implement the new electronic bill payment portion of Families First. The electronic bill payment processes for Phase I will:

- Use USBank's PowerTrack system to pay Transportation Service Providers;
- Use CWA as a tool to track and approve services performed by Transportation Service Providers; and,
- Provide information visibility for Stakeholders (Personal Property Shipping Offices, Military Services, General Service Administration, Transportation Service Providers, etc.).

*Regulation Flexibility Act*

This action is not considered rule making within the meaning of Regulatory Flexibility Act, 5 U.S.C. 601–612.

*Paperwork Reduction Act*

The Paperwork Reduction Act, 44 U.S.C. 3051 et seq., does not apply because no information collection or record keeping requirements are imposed on contractors, offerors or members of the public.

**Thomas Hicks,**

*Chief, Personal Property Division.*

[FR Doc. 03–14154 Filed 6–4–03; 8:45 am]

BILLING CODE 3710–08–M

---

## DEPARTMENT OF DEFENSE

### Department of the Army

### Availability for Non-Exclusive, Exclusive, or Partially Exclusive Licensing of U.S. Provisional Patent Application Concerning Handheld and Hand Powered Centrifuge Device

**AGENCY:** Department of the Army, DoD.

**ACTION:** Notice.

**SUMMARY:** In accordance with 37 CFR 404.6 and 404.7, announcement is made of the availability for licensing of the invention set forth in U.S. Provisional Patent Application No. 60/391,945 entitled "Handheld and Hand Powered Centrifuge Device," filed June 28, 2002. The United States Government, as represented by the Secretary of the Army, has rights in this invention.

**ADDRESSES:** Commander, U.S. Army Medical Research and Materiel Command, ATTN: Command Judge Advocate, MCMR–JA, 504 Scott Street, Fort Detrick, Frederick, MD 21702–5012.

**FOR FURTHER INFORMATION CONTACT:** For patent issues, Ms. Elizabeth Arwine, Patent Attorney, (301) 619–7808. For licensing issues, Dr. Paul Mele, Office of Research & Technology Assessment, (301) 619–6664, both at telefax (301) 619–5034.

**SUPPLEMENTARY INFORMATION:** This invention relates to centrifuge devices. More particularly, this invention relates to portable, handheld and hand-powered centrifuge devices, and methods using the same.

**Luz D. Ortiz,**

*Army Federal Register Liaison Officer.*

[FR Doc. 03–14156 Filed 6–4–03; 8:45 am]

BILLING CODE 3710–08–M

---

## DEPARTMENT OF DEFENSE

### Department of the Army

### Availability for Non-Exclusive, Exclusive, or Partially Exclusive Licensing of U.S. Provisional Patent Application Concerning Taqman Internal Positive Control

**AGENCY:** Department of the Army, DoD.

**ACTION:** Notice.

**SUMMARY:** In accordance with 37 CFR 404.6 and 404.7, announcement is made of the availability for licensing of U.S. Provisional Patent Application No. 60/361,455 entitled "Taqman Internal Positive Control," filed March 4, 2002. Foreign rights are also available (PCT/US03/06347). The United States Government, as represented by the Secretary of the Army, has rights in this invention.

**ADDRESSES:** Commander, U.S. Army Medical Research and Materiel Command, ATTN: Command Judge Advocate, MCMR–JA, 504 Scott Street, Fort Detrick, Frederick, MD 21702–5012.

**FOR FURTHER INFORMATION CONTACT:** For patent issues, Ms. Elizabeth Arwine, Patent Attorney, (301) 619–7808. For licensing issues, Dr. Paul Mele, Office of Research & Technology Assessment, (301) 619–6664, both at telefax (301) 619–5034.

**SUPPLEMENTARY INFORMATION:** The prevent invention generally relates to probes comprising a reporter molecule and a quencher molecule for use in nucleic acid assays. In particular, the present invention relates to a universal internal positive control that may be used in polymerase chain reaction (PCR) based assays.

**Luz D. Ortiz,**

*Army Federal Register Liaison Officer.*

[FR Doc. 03–14155 Filed 6–4–03; 8:45 am]

BILLING CODE 3710–08–M

---

## DEPARTMENT OF DEFENSE

### Department of the Army; Corps of Engineers

### Intent To Prepare a Draft Supplemental Environmental Impact Statement to the July 2002 Final Dredged Material Management Plan and Environmental Impact Statement, McNary Reservoir and Lower Snake River Reservoirs, in the States of Oregon, Washington, and Idaho

**AGENCY:** U.S. Army Corps of Engineers, DOD.

**ACTION:** Notice of intent.

**SUMMARY:** The U.S. Army Corps of Engineers (Corps), Walla Walla District, intends to prepare a Supplemental Environmental Impact Statement (SEIS) to the July 2002 Final Dredged Material Management Plan (DMMP) and Environmental Impact Statement (EIS): McNary Reservoir and Lower Snake River Reservoirs. The DMMP/EIS addressed a 20-year, programmatic approach the Corps would use to maintain the navigation channel within the Walla Walla District. The study reach considered includes Lake Wallula above McNary Dam on the Columbia River in Oregon and Washington; the four lower Snake River reservoirs extending from the mouth of the Snake River upstream to the communities of Lewiston, Idaho, and Clarkston, Washington; and the lower 2 miles of the Clearwater River from its confluence with the Snake River at Lewiston upstream to the U.S. Highway 12 Bridge. This supplement will reorganize and clarify information already included in the DMMP/EIS, expand the discussions and evaluations of measures considered in the DMMP/EIS, incorporate new information and data collected subsequent to the issuance of the DMMP/EIS, and modify alternatives, as needed, including the preferred alternative. When completed and approved, this SEIS, along with the DMMP/EIS will constitute the Corps'

Waianae Public Library, 85–625 Farrington Hwy., Waianae, Hawaii 96792–2406; Waialua Public Library, 67–068 Kealohanui Street, Waialua, Hawaii 96791; and UH Environmental Center, 317 Crawford Hall, 2550 Campus Rd., Honolulu, Hawaii 96822–2217.

The Draft EIS may also be reviewed at the following SBCT Web site: *http://www.SBCTEIS.com.*

Dated: September 22, 2003.

**Raymond J. Fatz,**

*Deputy Assistant Secretary of the Army, (Environment, Safety and Occupational Health), OASA(I&E).*

[FR Doc. 03–24482 Filed 9–26–03; 8:45 am]

BILLING CODE 3710–08–M

---

## DEPARTMENT OF DEFENSE

## Department of the Army

## Proposed Mandatory Use of US Bank's PowerTrack System by Department of Defense Personal Property Transportation Service Providers

AGENCY: Department of the Army, DOD.

ACTION: Notice.

SUMMARY: The Military Traffic Management Command (MTMC), as the Department of Defense (DOD) Traffic Manager for the Household Goods and Personal Property Program, proposes the mandatory use of U.S. Bank's PowerTrack System as the transaction and payment system for all DOD Transportation Service Providers (TSP), beginning with the implementation of Phase I of the Defense Future Personal Property Program, (Families First). Furthermore, the use of MTMC's Centralized Web Application (CWA) will also be mandatory. Implementation of PowerTrack at all Military Services and Coast Guard installations is the goal of Families First, which is the first step in moving toward the reengineered Personal Property Program of the future.

This announcement is being made to provide responses to comments received from the Federal Register notice published on June 5, 2003 (68 FR 33683) proposing mandatory use of U.S. Bank's Power TrackSystem by Department of Defense Personal Property Transportation Service Providers. The Electronic Billing and Payment portion of the Families First Web Site is located at *http://www.mtmc.army.mil*, under the Personal Property Program. The site offers industry access to updates on the Business Rules, Concept of Operations (CONOPS), and System Interface Specifications. The initial rollout of PowerTrack and CWA is proposed to begin October 2003.

ADDRESSES: Headquarters, Military Traffic Management Command, ATTN: MTPP–PD, Room 10N35–58 (George Thomas), Hoffman Building II, 200 Stovall Street, Alexandria, VA 22332–5000.

FOR FURTHER INFORMATION CONTACT: Mr. George Thomas at (703) 428–2237.

SUPPLEMENTARY INFORMATION: In response to the notice published June 5, 2003 we have received three sets of comments, one from an attorney representing a carrier association, one from a senior official representing a carrier association and one from a senior official representing an independent transportation Service Provider, within the 30-day comment period. A synopsis of these comments and responses appear below.

*Comment:* Application of Prompt Payment Act (PPA) needs to be addressed and clearly defined before implementing PowerTrack.

*Response:* As indicated in a 15 May 2003 letter from Defense Finance Accounting Services (DFAS) to the three major Industry associations, it is DFAS policy that PPA interest should be paid when a proper invoice, as defined in 5 CFR part 1315, is not paid within 30 days from receipt by the designated billing agency office. The third party billing agent will be the designated billing agency in the reengineered process. If there is a dispute over information on the invoice, to include price, quantity and/or compliance, the carrier will be notified within seven days of invoice receipt. This notification effectively stops the clock for computing PPA interest. Payment will be made within 30 days of receipt of corrected invoice to avoid payment of PPA interest. MTMC is working with DFAS and U.S. Bank to develop business rules which will outline and define the prompt payment process in Phase I.

*Comment:* Industry raised concerns about the proposed timeframe of Phase I implementation. Specifically, they do not believe October 2003 is a realistic date and believe the date should be moved to early 2003. According to Industry, adequate time was not given them to make computer-programming changes.

*Response:* According to plans, we are moving forward to implement PowerTrack in the current Personal Property Program in October 2003. Industry has been participating for the past year as members of the Electronic Billing/Payment Team. It has been communicated from the start what our plans were and on one occasion, we slipped the start date from July 03 to the current target date of October 2003. The initial rollout will be from limited shipping sites with only certain carriers participating.

*Comment:* Industry does not see the benefit of implementing PowerTrack using the current Military Rate Tariff (MRT) and suggest using the 400N Commercial Tariff during the Phase I Evaluation Period.

*Response:* Currently, we have a Rates Solicitation Team as part of the Families First program who are receiving the 400N Commercial Tariff. It is the intent of MTMC to negotiate with industry to use a modified version of the 400N Commercial Tariff in the Defense Future Personal Property Program as part of the overall Families First. However in the interim, our goal is to implement PowerTrack as part of the Phase I Evaluation Period using the current MRT. In the interest of time, we do not believe it is feasible to incorporate the 400N in Phase I since we have not completed our analysis of it. Instead, it will be part of our Phase II rollout plan.

*Comment:* Industry has raised concerns regarding the PPSO workload during Phase 1. Primarily, the PPSO's ability to perform additional workload during a time of downsizing, difficulty in completing their job timely in the current environment, and adequate training and assurance that sufficient resources will be provided TOs to ensure prompt payment.

*Response:* Presently, we are working with the Military Services to determine if there are additional workload requirements associated with implementing Phase I in the current program. The Services were asked to provide any data they may have to support their concerns. Our recommendation is to move forward with the Phase I Evaluation Period in order to establish the validity of these perceived workload concerns.

*Comment:* Industry wants to know what type of compensation will be given to those Transportation Providers who volunteer to participate in the Phase I Evaluation Period and how will they be compensated for added cost.

*Response:* All Transportation Providers participating as volunteers during the Phase I Evaluation Period will receive compensation. This will come in the form of a percentage adjustment similar in kind to the fuel surcharge. Participating TPs will apply the percentage adjustment on a shipment by shipment basis.

*Comment:* Industry believes that GSA request for hard copy documentation is a duplication of effort and TPs required to submit duplicates should be

compensated. They feel this is inconsistent with the Paperwork Reduction Act.

*Response:* MTMC's goal is to eliminate hard copy documentation that TPs are required to submit for processing invoices. We are working with the Services and GSA to come up with a solution that is amendable to all parties involved. To that end, we are moving forward to begin automation of the hard copy documentation in Phase I.

*Comment:* Industry believes the concept of pre-authorizing accessorial is a bad idea and wants to know if local agents will have access to CWA. They want to reserve the right to comment on CWA until more is known.

*Response:* The idea of pre-authorizing accessorials in CWA is to streamline the pre-approval process and make it more manageable and efficient for PPSOs and Transportation Providers. The current process of notes and sticky papers is cumbersome, tedious and unorganized. Due to the limited scope and functionality of CWA, local agents will have not have access to CWA during the Phase I process. However, they will have access during Phase II and implementation of DPS. We held several demonstrations of CWA and PowerTrack for Industry to preview. We will continue this process as we move forward with Phase II.

*Comment:* PowerTrack is an electronic billing and payment system that was designed for general freight shipments, not personal property shipments. The key difference between the two is the number of line items on an invoice, as personal property shipments have numerous accessorial charges that all need to match up accurately under PowerTrack's "matching" model. It is not an oversimplification to observe that it is much easier to "match" an invoice when only a handful of data points need to match than when there are hundreds of line items that must match.

*Response:* The process designed for the Families First program recognizes the differences between freight shipments and personal property shipments. For personal property shipments, the TP invoice will first be processed by PowerTrack to add a unique line item identifier code which will then be provided to CWA and returned with the corresponding line item of the BOL/GBL. The line item identifier code will allow for accurate matching of line items. Changes have been made to incorporate personal property business processes.

*Comment:* There have also been some reports that PowerTrack may offer carriers a reduced fee if they meet certain data transmission requirements. If this is true, the requirements for the discount need to be released publicly so all carriers can make plans to comply. The requirements also need to be reviewed to ensure that they do not discriminate against small businesses, which may not have access to the same equipment as larger companies.

*Response:* U.S. Bank makes available to Sellers two pricing options as fully described in the PowerTrack Seller Agreement. Preferred Pricing provides lower processing fees and requires the Seller to meet certain qualifications. Namely, transaction data must be provided to U.S. Bank either through the PowerTrack Web site or through an EDI—formatted electronic transmission over the Internet complying with PowerTrack's data format and protocol standards. The two methods allow any seller, regardless of size or technical capabilities, to qualify for the preferred pricing. In addition to providing transaction data to PowerTrack through one of the two methods, the seller must also agree to process payment requests within the PowerTrack System for any PowerTrack-capable buyer as requested by such buyer. For sellers who do not comply with the terms and conditions of Preferred Pricing, U.S. Bank makes Basic Pricing options available.

*Comment:* PowerTrack states that they will only hold payment data online for 13 to 16 months. The Statute of Limitations allows both the TP and the DoD/GSA the right to bill or deduct up to three years after a transaction; keeping data online for only 13–16 months invites more problems. PowerTrack should hold data online for the three years required.

*Response:* PowerTrack provides all customers, Buyers and Sellers, with 16 months of online transaction access. Each PowerTrack customer must decide what they want PowerTrack to do with the data after this point. Each PowerTrack customer has the option of paying PowerTrack to provide the long-term archival storage or receiving an archival extract and taking responsibility for their own archival storage and retrieval. PowerTrack's standard Archival Extract Files have been designed to provide each customer with 100% of the data PowerTrack has captured on their behalf for every type of document managed by PowerTrack in which the customer participates as either a Buyer or a Seller.

*Comment:* There is to be a new user interface from PowerTrack, their interface number 3.0, that is not yet been shown to TPs. It is stated to be ready in September, far too late for enough time for all 'Volunteer' TPs staff to be trained properly before the proposed start date.

*Response:* PowerTrack's Release 3.0 has been in production since January 2002. Enhancements and additional capabilities are being developed to support Personal Property shipments but much of the existing functionality, available today, will be utilized. PowerTrack along with MTMC are working to provide training to all TPs prior to them processing payments in the Families First Program. Training will include a Families First program overview, along with CWA and PowerTrack training. Training will be conducted prior to implementation.

*Comment:* We believe that there is a serious deficiency when PowerTrack only allows the Origin PPSO access to the shipment information. If there is a problem that can only be resolved in PowerTrack involving Destination PPSO charges, then the Destination PPSO must contact the Origin PPSO and ask them to work with the TP

*Response:* Functionality within PowerTrack and CWA has been designed to support the Origin PPSO role. Under the current Phase I process, audit exceptions will primarily be managed through CWA where both Origin and Destination PPSO's have access. This will minimize the number of problems that can only be resolved in PowerTrack involving Destination PPSO charges. However, MTMC and PowerTrack understands the concern regarding this design and is exploring new capabilities and the technical feasibility to allow Destination PPSO access to PowerTrack.

**Regulatory Flexibility Act**

This action is not considered rule making within the meaning the Regulatory Flexibility Act, 5 USC 601–612.

**Paperwork Reduction Act**

The Paperwork Reduction Act, 44 USC 3051 et seq., does not apply because no information collection or record keeping requirements are imposed on contractors, offerors or members of the public.

**Thomas Hicks,**

***Chief, Personal Property Division.***

[FR Doc. 03–24612 Filed 9–26–03; 8:45 am]

BILLING CODE 3710–08–M

JOB DESCRIPTION

Colonel Steven L. Amato
Deputy Chief of Staff (DCS) for Passenger and Personal Property
Military Surface Deployment and Distribution Command (SDDC)
Alexandria, Virginia

Deputy Chief of Staff for Program Director for a jointly staffed Army Major Command responsible for worldwide surface distribution and transportation for force deployment and forty percent of the DOD transportation budget. Provide leadership and ingenuity in identifying and implementing new programs, policy, and management practices. Interfaces with 985 commercial transportation service providers (TSPs), three industry associations, five military Services, USTRANSCOM, and the Office of the Secretary of Defense. Supervises 150 civilian personnel.

# Web Site Administration

# Policies & Procedures

**November 25, 1998**

Office of the Assistant Secretary of Defense
(Command, Control, Communications & Intelligence)
6000 Defense Pentagon
Washington, DC 20301-6000

protection from inappropriate manipulation and make reasonable efforts to verify its currency and accuracy.

2.4. Web Site Registration. All DoD Web sites shall register with the appropriate Service-level site or directly with DefenseLINK.

3. INFORMATION POSTING PROCESS

3.1. DoD Component Heads and Heads of subordinate organizations that establish Web sites are responsible for instituting a process for the identification of information appropriate for posting to Web sites and the appropriate security and access controls. The steps of this process (see illustration 1) include:

3.1.1. Identification of information that needs to be conveyed quickly and efficiently and thus will benefit from the attributes of the Web;

3.1.2. Identification of a specific target audience for the information;

3.1.3. Identification of the DoD Originating Office for the information if the sensitivity of the information or distribution restrictions on its release cannot be readily ascertained;

3.1.4. Review of the content for sensitivity and distribution/release controls, including sensitivity of information in the aggregate;

3.1.5. Determination of the appropriate access and security controls;

3.1.6. Approval of the information for public release in accordance with DoD Directive 5230.9 and DoD Instruction 5230.29 (references (h) and (o)) if it is to be posted to a publicly accessible Web site;

3.1.7. Posting the information, once all required steps have been taken;

3.1.8. Verification; and

3.1.9. Feedback reporting, to include "Lessons Learned."

## INFORMATION POSTING PROCESS




**Illustration 1. Information Posting Process**

3.2 Identification of Information. The World Wide Web provides the DoD with a powerful tool to convey suitable information quickly and efficiently on a broad range of topics relating to its activities, objectives, policies and programs. It is at the heart of the Defense Reform Initiative and is key to the reengineering and streamlining of our business practices. The American democratic process rests on the right of our citizens to know what government is doing, and the corresponding ability to judge its performance. Access to information by the public through the Web is an important component of this right. Nevertheless, careful examination of the potential consequences of placing information on the Web must be undertaken before it is made available.

3.2.1. The identification of a need to post information to a Web site will normally be made by the entity that generates the information and thus has the best knowledge of its content.

3.3. Identification of Target Audience. Illustration 2 depicts many of the target audiences for DoD information posted to the Web. Only information of value to the general public and which does not require additional protection should be posted to publicly accessible sites on the World Wide Web. Information requiring additional protection, such as FOR OFFICIAL USE ONLY (FOUO) information, information not specifically cleared and approved for public release, or information of questionable value to the general public and for which worldwide dissemination poses an unacceptable risk to the DoD, including military personnel and civilian employees, should be placed on Web sites with security and access controls.




**Illustration 2. Target Audience**

3.4. DoD Originating Office (DOO). Is the entity that created or sponsored the work that generated the information or received/acquired the information on behalf of the DoD. The DOO has the responsibility for assigning appropriate markings to information to include its sensitivity (i.e. classified, FOR OFFICIAL USE ONLY, or other distribution control markings for unclassified information), its releasability to the public, and the approved audience for access (e.g. DoD only, contractors, general public, etc.). The DOO shall be consulted whenever there is doubt with regard to the sensitivity of the information or distribution restrictions on its release.

3.5. Content Review.

3.5.1. Clearance Requirements for Publicly Accessible Web Sites. Heads of DoD Components must establish, in accordance with DoD Directive 5230.9 and DoD Instruction 5230.29 (references (h) and (o)), clearance review procedures for official DoD information that is prepared by or for DoD personnel and is proposed for posting to publicly accessible Web sites.

3.5.2. The above procedures must address the need for trained and knowledgeable personnel, familiar with the rules governing FOR OFFICIAL USE ONLY (FOUO) information as well as pertinent security classification guides, as appropriate. Such individuals must also be familiar with the aspects of the organization's operations considered critical, its vulnerabilities, as well as the pertinent threat in order to assess the nature of the risk associated with posting specific information to Web sites. This risk assessment must also include the increased sensitivity of certain information when electronically aggregated in significant volume.

3.5.2.1. In assessing the increased sensitivity that information may assume in electronic format, it is necessary to take into account the attributes of data mining (i.e., the nontrivial extraction of implicit, previously unknown, and potentially useful information from data). Data mining uses machine learning, statistical and visualization techniques to discover and present knowledge in a form, which is easily comprehensible to humans.

3.5.2.2. The content provider will also take into account the form in which the information was distributed, such as press releases, press conferences, or publicly disseminated documents, the susceptibility of the information to data mining, and the likelihood that the information could directly lead to the discovery and presentment of knowledge that is otherwise controlled (e.g., classified information or FOUO information). Also to be assessed is a specific risk to the Department's credibility if publicly released information is omitted and/or deleted from the Web.

3.5.2.3. If the overall risk resulting from posting the information is determined to be unacceptable, the information must be afforded security and access controls. Part V of this document provides additional guidance in this area while the paragraphs below provide specific prohibitions.

3.5.3. FOR OFFICIAL USE ONLY (FOUO). Information, the disclosure of which would cause a foreseeable harm to an interest protected by one or more of the exemptions to the Freedom of Information Act (FOIA), shall not be posted to a publicly accessible Web site. This information is designated FOUO pursuant to reference (j). While records containing FOUO information will normally be marked at the time of their creation, records that do not bear such markings shall not be assumed to contain no FOUO information without examination for the presence of information that requires continued protection and qualifies as exempt from public release. This may require coordination with the DOO for the information. The following examples are illustrative of the type of information that may be considered to be FOUO. **These examples are not an exclusive listing and they are not intended to offer any guidance in responding to Freedom of Information Act (FOIA) requests.**

3.5.3.1. Analysis and recommendations concerning lessons learned which would reveal sensitive military operations, exercises or vulnerabilities.

3.5.3.2. Reference to unclassified information that would reveal sensitive movements of military assets or the location of units, installations, or personnel where uncertainty regarding location is an element of a military plan or program.

3.5.3.3. Personal information including compilations of names of personnel assigned to overseas, sensitive, or routinely deployable units.

3.5.3.4. Information, the release of which would be a clearly unwarranted invasion of personal privacy, to include the following categories about U.S. citizens, DoD employees and military personnel: 1) Social Security Account Numbers;

2) dates of birth; 3) home addresses, and 4) telephone numbers other than duty office numbers. Duty phone numbers of units described in paragraphs C.3.2.1.6.2.2. of DoD 5400.7-R (reference (j)) may not be posted.

3.5.3.5. Names, locations, and specific identifying information about family members of DoD employees and military personnel.

3.5.3.6. Proprietary information submitted by a contractor and protected by a Limited Rights Statement or other agreement, and trade secrets, commercial and financial information submitted by an entity outside the government which considers the information to be protected from release to the public.

3.5.3.7. Test and evaluation information that could result in an unfair advantage or disadvantage to the manufacturer or producer.

3.5.3.8. Technical Information not marked or otherwise determined to be appropriate for Distribution Statement A in accordance with DoD Directive 5230.24 (reference (r)). This includes all technical information that can be used or be adapted for use to design, engineer, produce, manufacture, operate, repair, overhaul, or reproduce any military or space equipment or technology concerning such equipment.

3.5.4. Unclassified information pertaining to classified programs. The clearance review procedures for unclassified information pertaining to classified programs proposed for posting to a publicly accessible Web sites must take into account the likelihood of classification by compilation. Consultation with the program security classification guide may be required to determine the likelihood that the information, if compiled or aggregated with other information likely to be contained on publicly accessible Web sites, will reveal an additional association or relationship that meets the standards for classification under DoD 5200.1-R (reference (kk)). If such information is posted to a Web site, it must be afforded security and access controls as specified in Part V of this document.

3.5.4.1. In instances where a question arises as to whether information in compilation/aggregation requires protection as classified information, and the information has not yet been entered onto the Web site, the DOO(s) for the information shall be contacted to obtain a decision on the matter before the information is posted. Where the information has already been posted, the information will be withdrawn from the system and will not be re-posted until a decision is obtained from the DOO(s) for the information. In instances where there is a conflict among the DOOs as to the sensitivity of the information, which they are unable to resolve, the matter may be referred to the next higher level within each of the DOOs' organizations until a resolution can be obtained.

3.5.4.2. Users of a Web site who believe that information in compilation or aggregation on a system or systems to which they have access contains classified information, should contact the webmaster of the system(s) in question or, if

the webmaster is unknown, report the matter to their own organization's security office for evaluation and action as appropriate.

3.5.4.3. When conducting multi-disciplinary security assessments of Web sites, advanced search engines (e.g. high-end natural-language-based systems optimized for English syntax analysis) and other automated means will be used to assess the likelihood of the presence of information classified by compilation

3.5.5. Copyrighted Material. Copyrighted material will be used only when allowed by prevailing copyright laws and may be used only if the materials relate to the Component's mission. Consult with Counsel when using any copyrighted material.

3.5.6. Conflicts of Interest. In accordance with the Joint Ethics Regulation (reference (k)), product endorsements or preferential treatment of any private organization or individual shall not appear on any official DoD publicly accessible site.

3.6. Access Controls.

3.6.1. A DoD Web site may not post FOR OFFICIAL USE ONLY information, or information not specifically cleared and approved for public release unless it employs adequate security and access controls. Information of questionable value to the general public must be evaluated before worldwide dissemination to assess the risk to the DoD. Adequate security and access controls must likewise be employed for such information if it is determined to place national security, DoD personnel and assets, mission effectiveness, or the privacy of individuals at an unacceptable level of risk.

3.6.2 Determinations as to the appropriate security and access controls to employ will be based upon the sensitivity of the information, the target audience for which the information is intended, and the level of risks to DoD interests. Part V of this document contains additional guidance.

3.6.3. Publicly accessible DoD Web sites will not normally contain links or references to DoD Web sites with security and access controls. Under certain circumstances, however, it may be appropriate to establish a link to a log-on site provided details as to the controlled site's contents are not revealed.

3.7. Release Approval. Approvals for posting of information to publicly accessible Web sites must be in accordance with the provisions of DoD Instruction 5230.29 (reference (o)). Approvals can be granted only by an appropriately trained individual specifically delegated that authority by the Head of the DoD Component or his or her designee.

3.8. Information Posting. Once the procedures established in paragraphs 3.2, 3.3, 3.5, and 3.6. have been completed, the information may be posted to the Web. In addition, the following steps must be accomplished:

3.8.1. A reasonable effort to validate the accuracy of the information.

3.8.2. All links associated with the Web site have been validated.

4. ADMINISTRATION AND VERIFICATION

4.1. Web Server Environment Administration. Procedures governing the administration of the Web server environment must be established and, as a minimum, address the following:

4.1.1. Operation of the Web server environment.

4.1.2. Security of the Web server environment.

4.1.3. Maintenance of access and security control features and ensuring that warning and consent to monitoring notices are posted as appropriate.

4.1.4. Ensuring designated approving authority (DAA) approval is re-accomplished if any configuration changes are made to the Web server environment.

4.1.5. Ensuring all links from pages under its control are appropriate and valid.

4.1.6. Establishing procedures for content providers and page maintainers to place information on the Web server.

4.1.7. Granting and monitoring write-access privileges.

4.1.8. Maintaining and evaluating audit control logs.

4.1.9. Gathering and analyzing performance data.

4.1.10. Developing, coordinating, publishing, maintaining, and testing support plans for contingency and service restoration.

4.1.11. Coordinating mirror or replication sites with other system administrators, as required.

4.1.12. Implementing security and access controls requested by content providers and page maintainers as required.

4.1.13. Ensuring access lists are maintained where appropriate.

4.1.14. Incorporating a feedback mechanism for users' comments in accordance with the Paperwork reduction Act of 1995 (reference (a)).

# CERTIFICATE OF SERVICE

I certify under penalty of perjury that on this 6th day of November 2006, I caused to be served by hand delivery, PLAINTIFFS' SUPPLEMENTAL APPENDIX, addressed as follows:

Brian S. Smith,
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
Room 4054
1100 L Street, NW
Washington, DC 20530

s/Stanley I. Goldman
Stanley I. Goldman